R. P. PRICE, C. H. Kelly and Follace
Fields, Partners, d.b.a. Elkhorn Coal
Company, Plaintiffs-Appellees,

v.

UNITED MINE WORKERS OF AMER-
ICA, Defendant-Appellant.

No. 15046.

United States Court of Appeals
Sixth Circuit.

Oct. 3, 1964.

M. E. Boiarsky, Charleston, W. Va., and Harrison Combs, Washington, D. C., for appellant.

James S. Greene, Jr., Harlan, Ky., and Logan E. Patterson, Pineville, Ky., Patterson & Berger, Pineville, Ky., on brief, for appellees.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and PRETTYMAN, Senior Circuit Judge.

WEICK, Chief Judge.

This appeal presents questions concerning the liability of United Mine Workers of America under Section 303 of the Labor Management Relations Act 1947,[1] and the common law of Kentucky, for damages to Elkhorn Coal Company's business and property sustained by reason of the alleged commission by the Union of unlawful acts of secondary boycott, violence and depredation during an organizational strike in the coal fields of the Hazard-Letcher County, Kentucky area in 1959.

The case was tried before a jury in the District Court resulting in a plaintiffs' verdict, based on answers to interrogatories, in which the jury fixed compensatory damages at $150,000 and punitive damages at $100,000.

Two cases arising out of the same strike in Kentucky have been before this Court. Flame Coal Co. v. United Mine Workers of America, 303 F.2d 39 (CA 6, 1962) cert. denied 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125; Sunfire Coal Co., et al. v. United Mine Workers of America, 313 F.2d 108 (CA 6, 1963) cert. denied 375 U.S. 924, 84 S.Ct. 268, 11 L.Ed.2d 166. In these cases the activities of UMW

were revealed and need be repeated only briefly here.

The strike extended into the coal fields of Tennessee where similar acts of depredation were committed. These acts were detailed in our opinions in Allen v. United Mine Workers of America, 319 F.2d 594 (CA 6, 1963); White Oak Coal Co. v. United Mine Workers of America, 318 F.2d 591 (CA 6, 1963) cert. denied 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415; Gilchrist v. United Mine Workers of America, 290 F.2d 36 (CA 6, 1961) cert. denied 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76 and United Mine Workers of America v. Osborne Mining Co., 279 F.2d 716 (CA 6, 1960) cert. denied 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103.

Many of the questions raised in the present appeal have been repeatedly urged before us and decided adversely to UMW in the cases cited in the preceding paragraphs. They need not be redetermined.

After the oral arguments in this appeal were made and while the case was being considered by the Court, the Supreme Court granted certiorari in Morton v. Local 20, Teamsters, Chauffeurs & Helpers Union, 200 F.Supp. 653, aff'd 320

---

1. United Mine Workers of America is referred to herein as UMW. The pertinent provisions of 29 U.S.C. § 187 are:

 Labor Management Relations Act, 1947, Section 303 [29 U.S.C.A. 187]: *"Boycotts and other unlawful combinations; right to sue; jurisdictions; limitations; damages*

 "(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

 "(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or other-

 wise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

 "(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

 * * *

 * * * * * * *

 "(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

F.2d 505 (CA 6, 1963) cert. granted 375 U.S. 939, 84 S.Ct. 348, 11 L.Ed.2d 270. Thinking that Morton might control some of the issues here, we postponed further consideration to await the decision of the Supreme Court. Morton has now been decided [2] and leave was granted to counsel to file supplemental briefs in this appeal.

UMW contends that Morton controls the issues here. It argues that we have misapplied the doctrine of pendent jurisdiction in this case and in the cases which we have previously decided. It contends that Congress preempted the entire field in the enactment of Section 303 and, therefore, the state courts no longer have jurisdiction of a common law tort action for damages against a labor union for conspiracy or malicious destruction of a business or property; that it is wholly immaterial whether primary or secondary activities are attended by instigated riots, shootings or other methods of mob force and violence; that the sole remedy of an injured victim is a federal action under Section 303 in which jurisdiction is limited and state remedies may not be applied; that since jurisdiction has been preempted there is no pendent jurisdiction.

We do not understand that Morton sanctions any such propositions. Mr. Justice Stewart, who wrote the unanimous opinion of the Court, was careful to point out many times that Morton was a case of peaceful picketing and did not involve violence. He stated that a different rule applied to union violence, as follows:

"And in cases involving union violence, state law has been permitted to prevail by reason of controlling considerations which are entirely absent in the present case. '[W]e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. International Union, United Automobile, etc., Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; United Construction Workers, etc., v. Laburnum Const. Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025. * * * State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. * * *'", Id. at 257, 84 S.Ct. at 1257.

Morton affirmed the award of compensatory damages for a Section 303 violation but denied recovery for items of damage not covered by the Act, even though permitted by state law, because in the absence of force and violence the field was preempted by federal law. If Morton had been brought in the state court instead of the federal court, only federal law could have been applied. The Court indicated that since the state court would have been without authority to award damages under state law, the District Court under the doctrine of pendent jurisdiction had no greater power to do so.

Section 303 provides a remedy only for damages to business or property caused by unlawful secondary activities. It affords no remedy for injuries to person. It does not apply to unlawful primary activities. If UMW's contention is correct that Congress has preempted the entire field and there is no state or pendent jurisdiction, then the hapless victim of personal injuries, or damages inflicted to his property by unlawful primary activities is left without remedy in either state or federal courts. He could not sue for damages for an assault and battery committed on his person or for malicious destruction of his property or business.

We are taught, however, in Automobile Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1957) and United Workers v. Laburnum Corp.,

2. Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 that Congress, in enacting Section 303, did not deprive the victim of tortious conduct of his common law rights for all damages suffered. In Laburnum, the Supreme Court said:

"To recover damages under that section (303) is consistent with the existence of jurisdiction in state courts to enforce criminal penalties and common-law liabilities generally. On the other hand, it is not consistent to say that Congress, in that section, authorizes court action for the recovery of damages caused by tortious conduct related to secondary boycotts and yet without express mention of it, Congress abolishes all common-law rights to recover damages caused more directly and flagrantly through such conduct as is before us." Id. at 666, 74 S.Ct. at 838–839.

UMW attempts to distinguish these cases on the ground that jurisdiction was based on diversity of citizenship and not on Section 303 and that Section 303 provided a remedy which was not available in Russell and Laburnum. This is a distinction without a difference for their principles are applicable. The contention is refuted by the above quoted language in Laburnum where state jurisdiction was recognized in Section 303 cases.

Section 303 does not immunize unlawful acts of force and violence or malicious destruction of property committed by anyone in the course of a strike whether characterized as primary or secondary. It is not a haven for such conduct.

 Pendent jurisdiction became firmly embedded in federal law by the decision of the Supreme Court in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1932) which has been cited and relied on many times by the federal courts. See also: Hillsborough v. Cromwell, 326 U.S. 620, 629, 66 S.Ct. 445, 90 L.Ed. 358 (1945); Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Rumbaugh v. Winifrede Railroad Co., 331 F.2d 530, 539 (CA 4, 1964). Under Hurn, piecemeal adjudication of a claim by different courts was eliminated. When a substantial federal claim is asserted the federal court has jurisdiction to fully determine it including its local aspects. The federal and state claims are regarded merely as different grounds to support a single cause of action. United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52 (CA 6, 1959) cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038. This permits an award of punitive damages where authorized by state law. Automobile Workers v. Russell, supra, 356 U.S. at 646, 78 S.Ct. 932.

 The fact that a voluntary unincorporated labor organization may not be amenable to process in its common name in Kentucky does not affect the pendent jurisdiction of the federal court, for Section 303 permits suits against such an organization. We are concerned here with substantive rights not mere state procedural problems.

 The complaint alleges facts sufficient to state a substantial claim justiciable not only under federal law but by the common law of Kentucky. Paragraph 5 alleges a secondary boycott to induce Elkhorn's employees to engage in a concerted refusal, in the course of their employment, to handle or work on coal produced by other employers with the object of forcing plaintiffs to cease doing business with other employers and force them to recognize or bargain with UMW as the representative of the employees of such other employers although UMW had not been certified as such representative pursuant to the provisions of the National Labor Relations Act (29 U.S.C. § 159).

Paragraph 6 of the complaint alleged conduct on the part of UMW to induce the employees of other employers to engage in a concerted refusal to handle coal destined for plaintiffs' premises with the object of forcing and compelling other employers and persons to cease doing business with plaintiffs and compel plaintiffs to recognize UMW as the repre-

sentative of plaintiffs' employees although UMW had not been certified as such representative by the National Labor Relations Board pursuant to the provisions of the National Labor Relations Act.

Paragraphs 7 and 8 alleged acts of violence and depredation.[3]

These allegations set forth a substantial federal claim under Section 303. The District Court had jurisdiction to determine not only the merits of this claim but the state claim as well. Hurn v. Oursler, supra. We have applied this doctrine consistently in Allen, White Oak Coal Co., Flame, Sunfire, Osborne Mining Co., Gilchrist and Meadow Creek, supra.

■ The evidence, together with the inferences properly deducible therefrom, was sufficient to require submission of the factual issues to the jury.

The jury could find that the picketing was aimed not only at plaintiffs, but at about one hundred seventy-six coal operators in the field. Everyone in the field was affected. UMW was attempting to "persuade" coal operators to sign the National Bituminous Coal Wage Agreement as amended. Plaintiffs refused to sign it for two reasons: operations under it would be unprofitable and the agreement prohibited them from purchasing any coal from anyone except signers of the agreement. Plaintiffs did not mine coal. They purchased most of the coal which they processed and sold from small non-union operators. Plaintiffs processed the coal at their tipples.

The picketing extended to plaintiffs' employees and also mine operators and their employees, who supplied plaintiffs with coal, and truck drivers and their employees, who delivered coal to plaintiffs' tipples. The picketing was at tipples and at other areas in the field. The method of persuasion was as follows:

Whole mobs of men congregated. They heard addresses from UMW officials and then started out in huge motorcades to stop the mining operations of all mine operators in the field. As many as four hundred to five hundred men picketed plaintiffs' Mayking tipple on one occasion and one thousand men at other places in the field. Vile and abusive language was used; rocks were thrown at trucks; truck drivers were threatened with bull whips and shot at; shots were fired at the Mayking tipple, and at houses occupied by plaintiffs' employees; the Kona tipple was set on fire and destroyed; state police and the National Guard were called; injunctions were obtained from courts.

The Court did not err in his instructions to the jury. He read Section 303

3. "7. In pursuance of the unlawful activities set forth above, and with the intent and purpose to unlawfully and illegally interrupt, impede, terminate and destroy the business of plaintiffs, and the property of plaintiffs, the Union, through its duly constituted and authorized officers, agents, representatives and members, caused huge motorcades to be assembled and formed to roam the highways and roads, day and night, in and around the vicinity of the property and operations of the plaintiffs; caused large and violent mobs of men to assemble on and about the premises of plaintiffs, and in other areas in the general vicinity, to trespass upon the properties and premises of the plaintiffs, to threaten, abuse, intimidate and injure the employees of the plaintiffs, and other persons and their employees seeking and desiring to do business with plaintiffs, with the result that the plaintiffs' employees, persons seeking and desiring to do business with plaintiffs, and the employees of such persons, were alarmed and frightened and intimidated to such extent that the plaintiffs were unable to continue to operate their businesses, to do business with other persons, or to fulfill their business commitments and obligations.

"8. In furtherance of the illegal and wrongful activities set forth in Paragraphs 5, 6 and 7 above, the Union also caused the expensive and elaborate facilities and equipment located at Kona, Kentucky, and held under lease by the partnership, to be destroyed by fire, and to cause eight railroad cars of coal owned by the partnership to be destroyed in the same fire that destroyed said facilities and equipment, with the result that these properties and assets were rendered useless for the purposes of plaintiffs' business, and became of no market value."

to the jury and properly instructed them as to the law of secondary boycotts. He told the jury repeatedly that the Union had the lawful right to strike and to picket and was liable for damages only for unlawful acts which it committed or authorized. He gave illustrations and examples of the type of conduct which was unlawful.

His instructions as to punitive damages conformed to Kentucky law as we have interpreted it in Flame and Sunfire.

The award of compensatory damages was within the range of the testimony. The jury resolved the factual issues in favor of plaintiffs. We see no occasion to interfere with the jury's verdict.

Affirmed.