Mr. Justice Stewart
delivered the opinion of the Court.
The petitioner is a labor organization. The respondent is a company engaged in the business of providing dump trucks and drivers, as a subcontractor on highway construction, with its principal place of business at Tiffin, Ohio. The petitioner represented the respondent’s employees from 1950 until 1956 under an oral agreement. In 1956 the parties engaged in negotiations for a written agreement. An impasse in bargaining precipitated a strike which lasted from August to October of that year. During the strike the petitioner engaged in secondary activities involving some of the respondent’s customers and suppliers, for the purpose of inducing them to cease doing business with the respondent. Claiming that these activities were unlawful both under § 303 of the Labor Management Relations Act of 1947, 29 U. S. C. § 187,[1] and *386 under the common law of Ohio, the respondent sued the petitioner in the United States District Court for the Northern District of Ohio, claiming damages for business losses caused by the petitioner’s allegedly unlawful conduct during the strike.
*387 After a trial without a jury, the District Court found that the petitioner had encouraged the employees of France Stone Co., a supplier of the respondent, and the employees of C. A. Schoen, Inc., and O’Connel Coal Co., customers of respondent, to force their employers to cease doing business with the respondent, in violation of § 303 of the federal Act.[2] The court awarded the respondent some $1,600 damages for business losses caused by this violation of federal law.[3] The court also determined that during the strike the petitioner had persuaded the management of Launder & Son, Inc., another of the respondent’s customers, to refrain from doing business with the respondent. Since there had been no approach to Launder’s employees, the court held that the request to Launder management was permissible activity under federal law, but ruled that this conduct violated the common law of Ohio, which, the court said, prohibits “making direct appeals to a struck employer’s customers or suppliers to stop doing business with the struck employer . . . .” The respondent was accordingly awarded almost $9,000 as compensatory damages for this violation of Ohio law.[4] In addition, the court awarded the respondent more than $9,000 for the loss of a contract to haul sand for the Wilson Sand & Gravel Co., which loss had resulted from an insufficient number of drivers available during the strike to perform the contract. This award was based upon the court’s reasoning that the respondent was entitled to recover damages measured by all of the profits lost as a result of the petitioner’s total strike activity, so long as some of that activity was unlawful.[5] Finally, the court awarded punitive damages of $15,000, although expressly finding that the petitioner’s *388 conduct during the strike had at all times been free of any violence.[6]
The Court of Appeals affirmed the award in all respects.[7] Relying on the doctrine of pendent jurisdiction, Hurn v. Oursler, 289 U. S. 238, and cases involving union violence, e. g., Flame Coal Co. v. United Mine Workers, 303 F. 2d 39, the appellate court concluded that "[a] nonfederal cause of action is not extinguished because a state court is pre-empted by federal law from providing relief,” [8] and that “punitive damages are recoverable for unlawful secondary boycott activities . [9] Certiorari was granted to consider the issues of federal labor law which this case presents. 375 U. S. 939.
At the outset we affirm the award of compensatory damages for the violation of § 303 of the federal Act. The District Court found that “the defendant encouraged the employees of the O’Connel Company to stop using plaintiff’s trucks for the purpose of forcing or requiring the O’Connel Company to cease doing business with the plaintiff . . . .”[10] This finding of a clear violation of § 303 was supported by the evidence, as was the amount of damages awarded therefor.[11]
With respect to the remaining components of the money judgment recovered by the respondent, the central question to be decided is whether a court, state or federal, is free to apply state law in awarding damages resulting from a union’s peaceful strike conduct vis-á-vis a secondary employer, or is confined in the field of damage actions brought for union secondary activities to the spe *389 cifically limited provisions of § 303 of the federal Act. We disagree with the Court of Appeals that this question can be resolved either by reference to the doctrine of pendent jurisdiction or by reference to the line of precedents which have permitted state law to be applied in situations where union activities involving violence were present.
If the provisions of § 303 mark the limits beyond which a court, state or federal, may not go in awarding damages for a union's secondary activities, then the doctrine of pendent jurisdiction can be of no service. Pendent jurisdiction permits a federal court under some circumstances to determine a state cause of action which otherwise would have to be heard in the state court. Hum v. Oursler, supra. But if the state court would be without authority to award damages under state law, then the doctrine of pendent jurisdiction can give “the District Court ... no greater power to do so.” Lauf v. Skinner & Co., 303 U. S. 323, 328.
And in cases involving union violence, state law has been permitted to prevail by reason of controlling considerations which are entirely absent in the present case. “ [W] e have allowed the States to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order. United Automobile Workers v. Russell, 356 U. S. 634; United Construction Workers v. Laburnum Corp., 347 U. S. 656. . . . State jurisdiction has prevailed in these situations because the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. ... In the present case there is no such compelling state interest.” San Diego Bldg. Trades v. Garmon, 359 U. S. 236, 247-248.
*390 It is the respondent's contention, however, that since the petitioner union's peaceful conduct was neither arguably-protected under § 7 nor arguably prohibited under § 8 of the National Labor Relations Act, as amended, the trial court was free to award damages on the basis of state law for injuries caused by this conduct. But even though it may be assumed that at least some of the secondary activity here involved was neither protected nor prohibited, it is still necessary to determine whether by enacting § 303, “Congress occupied this field and closed it to state regulation.” Automobile Workers v. O’Brien, 339 U. S. 454, 457. The basic question, in other words, is whether “in a case such as this, incompatible doctrines of local law must give way to principles of federal labor law.” Teamsters Local 174 v. Lucas Flour Co., 369 U. S. 95, 102. The answer to that question ultimately depends upon whether the application of state law in this kind of case would operate to frustrate the purpose of the federal legislation. Colorado Anti-Discrimination Comm’n v. Continental Air Lines, 372 U. S. 714, 722.
Section 303 (b) of the Labor Management Relations Act expressly authorizes state and federal courts to award damages to any person injured by certain secondary boycott activities described in § 303 (a).[12] The type of conduct to be made the subject of a private damage action was considered by Congress, and § 303 (a) comprehensively and with great particularity “describes and condemns specific union conduct directed to specific objectives.” Carpenters Local 1976 v. Labor Board, 357 U. S. 93, 98.[13] In selecting which forms of economic pressure *391 should be prohibited by § 303, Congress struck the “balance . . . between the uncontrolled power of management and labor to further their respective interests,” id,., at 100, by “preserving the right of labor organizations to bring pressure to bear, on offending employers in primary labor disputes and [by] shielding unoffending employers and others from pressures in controversies not their own.” Labor Board v. Denver Bldg. & Construction Trades Council, 341 U. S. 675, 692.
In this case, the petitioner’s request to Launder’s management to cease doing business with the respondent was not proscribed by the Act. “[A] union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.” Carpenters Local 1976 v. Labor Board, supra. at 99. This weapon of self-help, permitted by federal law, formed an integral part of the petitioner’s effort to achieve its bargaining goals during negotiations with the respondent.[14] Allowing its use is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. Electrical Workers Local 761 v. Labor Board, 366 U. S. 667, 672. If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it *392 enacted § 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. “For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.” Garner v. Teamsters Union, 346 U. S. 485, 500. We hold, therefore, that the damages awarded against the petitioner based upon its peaceful persuasion of Launder’s management not to do business with the respondent during the strike cannot stand.
The same considerations require reversal of the award of punitive damages. Punitive damages for violations of § 303 conflict with the congressional judgment, reflected both in the language of the federal statute[15] and in its legislative history,[16] that recovery for an employer’s business losses caused by a union’s peaceful secondary activities proscribed by § 303 should be limited to actual, compensatory damages. And insofar as punitive damages in this case were based on secondary activities which violated only state law, they cannot stand, because, as we *393 have held, substantive state law in this area must yield to federal limitations. In short, this is an area “of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law.” Sola Electric Co. v. Jefferson Electric Co., 317 U. S. 173, 176. Accordingly, we hold that since state law has been displaced by § 303 in private damage actions based on peaceful union secondary activities, the District Court in this case was without authority to award punitive damages.[17]
There remains for consideration only the question of the damage award for the respondent’s loss of the Wilson account. The respondent conceded at trial that there was “no evidence of unlawful activity in connection with this [the Wilson] job,” and the record makes clear that the respondent lost the Wilson account because his drivers were discouraged from working during the strike by the petitioner’s primary strike activity.[18] Since § 303 (b) authorizes an award of damages only in the event of injury “by reason of any violation of subsection (a)” and peaceful primary strike activity does not violate § 303 (a), Electrical Workers Local 761 v. Labor Board, 366 U. S. 667, 672, the District Court was without power to award damages proximately caused by lawful, *394 primary activities, even though the petitioner may have contemporaneously engaged in unlawful acts elsewhere. See Chauffeurs Local 175 v. Labor Board, 294 F. 2d 261.
The judgment is vacated and the case remanded to the District Court for further proceedings consistent with this opinion.

It is so ordered.

 Section 303 of the Labor Management Relations Act of 1947 provided:
“(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—
“(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise *386 dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;
“(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
“(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
“(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under áubchapter II of this chapter.
“(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.” 61 Stat. 158, 29 U. S. C. § 187.
Certain amendments to § 303 were made by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 545, 29 U. S. C. (Supp. IV) § 187, but these amendments are not germane to the questions presented in this case.

 200 F. Supp. 653, 658-659.

 Id., at 661.

/A, at 656, 661.

 Id., at 656, 658, 661.

 Id., at 661.

 320 F. 2d 505.

 Id., at 507.

 Id., at 508.

 200 F. Supp., at 659.

 No damages were awarded with respect to the petitioner’s dealings with the employees of France Stone Co. or C. A. Schoen, Inc.

 See note 1, supra.

 Section 8 (b) (4), 29 U. S. C. § 158 (b) (4), and § 303, 29 U. S. C. § 187, “have an identity of language” but specify two “different remedies.” Longshoremen v. Juneau Corp., 342 U. S. 237, 244. Section 8 (b) (4) provides that certain conduct constitutes an unfair *391 labor practice for which an administrative remedy is afforded. The same conduct under § 303 also gives rise to a claim for damages cognizable in either state or federal courts. As a consequence of the 1959 amendments to the Act, § 303 now incorporates by reference the prohibitions embodied in § 8 (b)(4).

 No claim has been made that Launder’s voluntary compliance with the petitioner’s request, unsupported by any consideration, amounted to an “agreement, express or implied” under § 8 (e) of the Act, added by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C. (Supp. IV) § 158 (e).

 Section 303 (b) provides in pertinent part that “[wjhoever shall be injured in his business or property . . . shall recover the damages by him sustained , . . .” (Emphasis supplied.)

 In the Senate debate on the bill, Senator Taft said, "... I see no reason why suits of this sort should not be permitted to be filed. After all, it is only to restore to people who lose something because of boycotts and jurisdictional strikes the money which they have lost.” 93 Cong. Rec. 4858. Later, in response to Senator Morse’s claim that § 303 would impose virtually unlimited liability, Senator Taft said, “Under the Sherman Act the same question of boycott damage is subject to a suit for damages and attorneys’ fees. In this case we simply provide for the amount of the actual damages.” 93 Cong. Rec. 4872-4873.

 See United Mine Workers v. Patton, 211 F. 2d 742, 747-750; Overnite Transportation Co. v. Teamsters, 257 N. C. 18, 125 S. E. 2d 277, cert. denied, 371 U. S. 862.

 It is argued that the petitioner’s unlawful secondary activities made more effective the petitioner’s attempts to discourage employees of the respondent from working during the strike. But there is nothing in the record to indicate, and no finding by the trial court, that the petitioner’s secondary activities which were unlawful under § 303 had any effect whatsoever on the respondent’s employees’ decisions not to work during the strike.